In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-24-00161-CR

TERRY ANTONIO JOHNSON III, Appellant

V.

THE STATE OF TEXAS, Appellee

_____

**On Appeal from the 356th District Court
Hardin County, Texas
Trial Cause No. 27114**

_____

## MEMORANDUM OPINION

A grand jury indicted Terry Antonio Johnson III for the first-degree felony offense of murder. *See* Tex. Penal Code Ann. § 19.02(b), (c). After a trial, a jury rejected Johnson's claim of self-defense, found him guilty of murder, assessed punishment at life plus a $10,000.00 fine, and the trial judge sentenced him

accordingly. Johnson timely appealed.[1] In four issues, Johnson contends that: (1) the evidence was insufficient to support the jury's rejection of his self-defense claim; (2) the trial court abused its discretion by denying a continuance after the State violated *Brady* and article 39.14 of the Texas Code of Criminal Procedure when it produced hundreds of pages of documents on the eve of trial, which prejudiced his right to investigate and present a defense; (3) he was denied effective assistance of counsel; and (4) the trial court abused its discretion and violated his right to present a complete defense when it excluded testimony from the decedent's girlfriend. As discussed below, we affirm the trial court's judgment.

## I. BACKGROUND AND TRIAL EVIDENCE[2]

On April 15, 2022, Johnson was a passenger in the backseat of his brother-in-law, Raul Rebollar's, truck. Johnson's brother-in-law and two minor nephews were in the truck; his teenage nephew "Jack" was the front passenger, and his younger

---

[1]Johnson's first appointed attorney on appeal filed an *Anders* brief. *See Anders v. California*, 386 U.S. 738, 744–45 (1967); *High v. State*, 573 S.W.2d 807, 810–13 (Tex. Crim. App. [Panel Op.] 1978). After reviewing the record, we entered a *Stafford* order, abated the appeal, and remanded the case for appointment of new counsel and re-briefing. *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991). The trial court appointed new appellate counsel, and the matter has been re-briefed.

[2]For purposes of organization and clarity, in our discussion of Issue Four below, we will outline facts pertaining to Johnson's assertion that the trial court erred by excluding testimony of Rebollar's girlfriend.

2

nephew "Jim" was in the backseat with Johnson.[3] Both Johnson and Rebollar had guns with them. As they traveled north on Highway 96 in Lumberton, Johnson shot Rebollar with his Glock handgun multiple times in the back of the head as Rebollar drove. The truck then crashed and came to a stop. Johnson claims he shot Rebollar in self-defense.

## A. Motion for Continuance

On the morning trial began, Johnson filed a verified Motion for Continuance with a proposed Order. In that Motion, Johnson asserts that on the Friday before trial, his attorney received from the State "two separate supplemental discovery packets with hundreds of pages of new evidence after her office closed." Johnson complained in the Motion for Continuance of violations of the Michael Morton Act, specifically article 39.14 of the Texas Code of Criminal Procedure. Johnson complains that the late production of evidence "highly prejudices defense counsel's assessment of the case, strategy[,] and violates Defendant's right to effective assistance by depriving defense counsel of her ability to provide competent representation that is adequate to ensure a fair trial." The Motion does not describe the substance of any evidence in the late production. The record also does not contain

---

[3]We use pseudonyms to protect the identities of Rebollar's children who witnessed their father's murder and obscure the name of their mother by referring to her as "Mother." *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

a ruling on the Motion for Continuance or show that it was presented to the trial court. The Reporter's Record likewise does not show that any *Brady* violations or article 39.14 complaints were brought to the trial court's attention.

## B. Baiyang Xu, M.D. (forensic pathologist)

The State's first witness was forensic pathologist Dr. Baiyang Xu. Although another pathologist performed the autopsy, Xu reviewed the photographs and autopsy report then reached an opinion on the cause of death. Xu testified that Rebollar's cause of death was a gunshot wound to the head. During Xu's testimony, the trial court admitted autopsy photographs over the defendant's objection. The defense did not cross-examine Xu.

## C. Rachel Henderson

Rachel Henderson testified that she was in the area where the shooting occurred and heard the gunshots. She recalled seeing a truck roll into another truck, and she saw the crash. Henderson said she called 911, because there was a man with his head on the steering wheel with blood on his head.

She described seeing a teenager exit the front passenger's seat, and a younger boy came out of the back driver's seat. Henderson testified that the little boy walked away from the car visibly upset and had blood and brain matter on him. According to Henderson, both the younger boy and the older boy said that their uncle shot their

4

father. Henderson denied hearing the teenager say that his father was going to shoot his uncle.

**D. Stephen Schwaab**

Stephen Schwaab testified that he is a paramedic with Acadian Ambulance. He came upon this scene about 6 p.m. but was off duty. Schwaab realized there was a traffic accident, so he approached and observed "the driver slumped over, with extensive injuries to his head and face, with blood coming out. And he was not breathing." Schwaab also observed someone sitting behind him in the backseat, so he walked around and asked that person if he was okay. The man in the backseat told Schwaab he was okay and said, "But he's dead, and I shot him in the back of the head." Schwaab instructed the man to put his hands where he could see them and not to move until police arrived. Schwaab asked the man where the gun was, and he responded it was at his feet on the floor. During Schwaab's testimony, photographs of the scene were admitted into evidence showing blood and possible brain matter, which he discussed. The defense did not question Schwaab.

**E. Samuel Jones**

Samuel Jones testified that he is a field training officer with the Lumberton Police Department. Jones was the first Lumberton police officer on the scene. He said that "it was probably the most chaotic and brutal scene I've ever been to."

As he approached the victim's vehicle, Jones learned the shooter was in the backseat. He then ordered Johnson out of the vehicle, and they detained him and placed him in a patrol unit. Jones noted that Rebollar's teenage son, Jack, ran in and out of traffic and how chaotic the scene was. Jones described trying to calm down Jack, having to grab him out of traffic, and Jones got "brain matter" on himself in the process. According to Jones, Jack was sitting in the front passenger seat. Jones testified that Jack told him it was self-defense.

During Jones's testimony, multiple photographs of the scene, victim, and firearms were admitted into evidence. One photograph showed a sawed-off shotgun in the truck. Another photograph showed a black handgun on the floorboard between the driver's feet with a casing. Jones's body cam footage was also admitted into evidence, and excerpts were played for the jury.

Jones testified that the video showed Jack saying his dad "tried to shoot my uncle[,]" and that his dad is dead, and his dad was drunk. According to Jones, another witness on the scene at minute 29:30 said that the backseat passenger told the witness he shot Rebollar, it was self-defense, and he had to, because Rebollar said he would kill them. Jones notes that on video an EMT was taking notes that said, "Dad had a gun, threatening to shoot Uncle first, Uncle was scared he was about to die and shot him."

## F. Forrest Cobb

Captain Forrest Cobb with the Lumberton Police Department testified at trial. On April 15, 2022, Cobb and Sergeant Wilson interviewed Johnson immediately after the shooting at the police department's offices. A video recording of this interview was admitted into evidence and played for the jury.

In the video, Johnson repeatedly told Cobb and Wilson that he shot Rebollar in the back of the head but claimed it was self-defense. According to Johnson, Rebollar was supposed to drop Jack off at his apartment. He and Rebollar had been drinking, but they went to buy "weed" and liquor. Johnson said that they also both had handguns, and although he did not observe Rebollar's gun while they were in the truck, he knew it was in Rebollar's waistband. He said that Rebollar began to act suspicious, but he did not know why. Cobb testified, and the interview showed, that Johnson claimed Rebollar began talking about going to "slide on somebody," which was a reference to a drive-by shooting. Cobb said that when he asked Johnson who he believed Rebollar wanted to "slide" up on, Johnson responded that Rebollar was referring to him.

According to Johnson, immediately before the shooting, he saw Jack begin to wrestle Rebollar's arm to keep Rebollar from grabbing his gun, Jack told Rebollar not to do it, then Jack told Johnson he needed to get his gun ready. Johnson claimed that at that point, he feared for his life and shot Rebollar repeatedly in the back of

7

the head. During the interviews, Johnson said he did not know how many times he shot but thought it was "four or five" times; Johnson stopped shooting when Jack held his arm down and told him "that's enough." Johnson told officers that Rebollar was looking forward when Johnson shot him. Johnson explained that he did not see Rebollar's gun before he shot; he only knew Rebollar had a gun and saw Jack holding down Rebollar's hands and telling Rebollar not to do it.

Two additional videos were admitted into evidence and played for the jury during Cobb's testimony. These included a nearby business's footage of the truck crashing after the shooting and Jack running from the truck, and a video of Johnson's second recorded interview with Cobb and Texas Ranger Joseph Dreaden.

Cobb testified about the second recorded interview. He explained that Dreaden was a Texas Ranger assigned to the area who assisted with the investigation. At one point in the video, Cobb told Johnson that "things were not adding up," which Cobb said was in reference to the location of the bullet wounds. The interview shows that Johnson denied that his nephew Jack Rebollar ever fired a shot. Cobb testified that Johnson repeatedly demonstrated where he shot from and how far away, but there was a bullet wound in Rebollar's mouth, which was "through and-through-the-cheek" and was "very close . . . due to the stippling that's present." Cobb testified that stippling was gun powder that contacted and burned the skin. Cobb stated that although Johnson claimed that Rebollar turned his head sideways at one point, when

8

Johnson fired, he shot Rebollar in the back of the head, because Rebollar was facing forward.

Cobb explained that given the truck's configuration, for Rebollar to have shot at Johnson with the gun in his right hand, he would have to flip his gun upside down or turn around while holding the steering wheel with his left hand. Cobb disputed Johnson's self-defense claim noting the location of the bullets and trajectories. Cobb noted that "all the shots are directed to the back of the head and off to the side[,]" which indicated that Johnson "was truthful about where he was sitting and the direction he fired from[.]" Cobb added that "for this gun to have been a serious threat to [Johnson], at that point . . . [Rebollar] would have either had to have swapped hands and shot this away, or this way, because he wasn't over here." Also, according to Cobb, the location of Johnson's shoes found in the truck suggested Johnson told the truth about sitting in the middle of the backseat.

Cobb testified that in September 2018, Rebollar and Johnson's sister had divorced. He explained that Rebollar and Johnson's sister had three kids together, but only two were in the car.

Cobb testified that he watched Officer Jones's body camera footage, and beginning at five minutes and nine seconds, Cobb agreed it sounded like Jack said that he shot his father when his uncle asked his father not to shoot, "but it's hard to hear." Cobb explained that Jack shooting his dad made more sense regarding the

side-to-side bullet, "due to the seating position and the trajectory of the projectile." One bullet went through both of Rebollar's cheeks. Cobb said that there was also a through-and-through shot in the arm and another in the arm. Cobb did not believe those things added up, along with what Johnson said about Rebollar's gun. Johnson told him that Rebollar had a "baby Glock" because he saw it at his apartment, but Rebollar's gun was a Sig. This led Cobb "to believe maybe he didn't really even see that gun." Photographs of each firearm were admitted into evidence.

Cobb testified that Johnson claimed his life was in danger, so he shot Rebollar. Johnson also told Cobb that he saw Rebollar doing something in his lap area, and Jack was trying to hold Rebollar's hand down. Johnson told Cobb that Jack saw more than he did, like Rebollar taking the pistol and pointing it back between the seats. Cobb testified that Johnson also told him that Jack must have seen what Rebollar was about to do and warned Johnson what would happen. He also told Cobb that Rebollar was driving aggressively and would not tell anyone where he was going after he missed his turn. Cobb testified that the toxicology report showed Rebollar's blood alcohol content was .21, which was over the legal limit.

Cobb said crime scene investigators collected bullets, and the Jefferson County Crime Lab prepared the ballistics reports. During his testimony, the jury was shown photographs of the truck's contents, including several bullet casings at Rebollar's feet. The ballistics report was also admitted into evidence. Cobb testified

that they recovered a "Glock model 17 Gen 5" firearm from the backseat, which belonged to Johnson. They also recovered a Sig Sauer model P365 XL firearm, which they found at Rebollar's feet. Cobb testified that the Glock 17 fired eleven of the recovered shell casings. Six other shell casings recovered were fired from the Sig Sauer gun at Rebollar's feet. Cobb agreed there were spent casings from both guns in the vehicle, but they could not determine when those casings were fired. Cobb explained, though, that based on Johnson's interview and how many bullets remained in his clip, the eleven casings from his Glock 17 came from the day of the shooting, since Johnson was not in the truck before that day. The six casings that matched the Sig Sauer found at Rebollar's feet could have come from that weapon at any time, but Johnson said that Rebollar never fired any shots.

## G. Chad Wilson

Chad Wilson testified that he works for the Lumberton Police Department as a criminal investigator. Wilson went to the scene, then conducted the first interview of Johnson with Cobb. Wilson described Johnson as "very calm, cool and collected, to have just been involved in a very traumatic incident." He testified that Johnson was sitting in the interview with blood and brain matter on him and was "cold to the world. It doesn't affect him at all." Wilson said that Johnson's demeanor was "abnormal." Johnson told them it was self-defense, and he feared for his life yet acted this way. On cross-examination, Wilson agreed that Johnson told them

11

repeatedly he feared for his life and that is why he shot Rebollar; he also mentioned his nephew and appeared worried about everyone in the truck.

**H. Kenneth Powell**

Kenneth Powell testified that he has worked for the Lumberton Police Department for thirty years and spent fifteen years in criminal investigations. When he arrived at the scene, one of the first things he observed was Jim—the youngest son—throwing up on the side of the highway. He heard Jim say that "his tio shot his daddy for no reason[.]" Powell explained that he understood "tio" was Johnson, and "tio" was Spanish for "[u]ncle."

Powell explained that he helped look for cameras, organized the scene, and assigned officers to specific duties. When Powell arrived, Jack "was in a state of hysteria, being difficult to control." Powell described trying to find someone to take custody of Jack and Jim, and he reached the Mother. He later learned that Mother and Rebollar were divorced.

**I. Mother**

The defense called Mother to testify, who was Rebollar's ex-wife and Johnson's sister. Mother said that she and Rebollar have three children, including Jack and Jim. They had been together since 2003, they married in 2015, and she only learned after Rebollar's death that he had divorced her in 2018.

Mother testified that Rebollar was a "nice guy," but he was "mean" and violent towards her and their children when drunk. She told the jury that Rebollar drank and did drugs. According to Mother, Rebollar had a criminal history that included family violence and DWIs. Mother said that Johnson is her brother and characterized him as a "good kid" who she never observed be violent.

Mother testified that Rebollar "always carried a gun[,]" although he was not allowed to. She overheard the boys' conversations and thought that "slide" meant shooting at somebody. Mother testified that she witnessed Rebollar doing drive-by shootings at her house "plenty of times," and there were police reports.

Mother said that when she arrived at the scene of the shooting, Jack and Jim were hysterical. Initially, she testified that she allowed police to talk to both boys but later said that she could not really remember whether she let police speak with Jim.

The State also called Mother again as a witness on rebuttal. She explained that the Lumberton Police returned Jim and Jack to Rebollar's house in Beaumont, which was where the kids were staying that weekend. Mother testified that Rebollar's girlfriend leased the house, and Rebollar was not on the lease. Mother was on probation for burglarizing that house but claimed the charges were "fake."

13

## J. Testimony of Jim

The defense called Jim, Rebollar's youngest son, to testify. Jim was twelve during trial but was ten when the shooting occurred. At some point that day, Rebollar picked Jim up in his girlfriend's car. According to Jim, his dad "was drunk, and his eyes were red."

At times, Jim's testimony was hard to follow. Jim described a disagreement his father and Jack had over a gun. He testified that his father asked him where someone named Derek lived, because Jack had stolen their father's gun but sold it to someone named Derek. Jim explained that their father was mad at Jack for selling the gun at first, but they "got back along." Jim said that he asked Rebollar why he wanted to know where Derek lived, and Rebollar stated he was not going to shoot Derek "right now." Jim testified that he told Rebollar, "No. Chill out[.]" Jim also testified that his father's girlfriend "told him to go shoot up her baby-daddy store[.]" According to Jim, the girlfriend "tried to offer" his brothers to go do it, but they did not do it.

Jim also described going to Johnson's house that day with his father and Jack. He explained that Rebollar started "talking smack" about Johnson's brother, who was also Jim's uncle, and Johnson told Rebollar to stop. Johnson and Rebollar also "slap boxed" but eventually, Rebollar made a face and looked angry. According to Jim, after that, they all began talking normally again.

14

When they prepared to leave Johnson's house, Rebollar told Johnson to ride with him. Jim testified that he was in the backseat behind his dad, and Johnson was beside him. Jim thought they "were going to do a drug deal." Jim claimed that later, Rebollar said, "Let's go shoot up my girl's baby-daddy's house." Jim testified that Johnson responded, "I haven't spoke to you in a while. I guess, let's go." He added that Johnson told him to switch seats with him, "like when he was going to shoot go up the house, so I'd be by him. We was going to go do the drug deal first."

Jim then described another disagreement in the truck between Johnson and his dad over $20; although Jim could not recall what was said, he knew his dad "got mad because he started doing the face again." Jim explained that he saw something in the seat, "like it was being poked[,]" and Jack said, "Hey, no, Dad, chill out." Jim testified that "[m]y dad told me to put my head down." Jim said he put his head down, then picked it back up and saw that Johnson "looked scared." Then Jim explained that Johnson "ended up like grabbing his gun, and he ended up shooting my dad."

Jim explained that his father was drunk, but "he looked like he was on more stuff, because his eyes were red. When he was drunk, his eyes were never red." Jim believed that his dad would do something to Johnson. Jim explained that when Johnson shot his dad, he "heard something fall on the side of his seat."

15

The prosecutor also asked Jim about being dropped off after the incident at their dad's house and whether they burglarized the house. Jim denied that they burglarized the home, said they wanted memories of their dad, and that they "grabbed clothes and pictures."

## K. Other Evidence

Other evidence admitted at trial included: photographs of Johnson, the scene, and the victim; Jones's bodycam and dashcam video; video of the accident from a nearby bank; video interviews of Johnson conducted by police; photographs of the firearms; and the Jefferson County Regional Crime Laboratory Firearms Report.

## L. Jury's Verdict and Post-Verdict Motion

The jury rejected Johnson's claim of self-defense and found him guilty of murder. The jury assessed punishment at life in prison plus a $10,000 fine, and the trial court sentenced Johnson accordingly. After the jury's verdict, Johnson filed a Motion for Judgment of Acquittal complaining only about the sufficiency of the evidence supporting the jury's rejection of self-defense and murder conviction. There was no ruling on this Motion, nor does the record reflect there was a hearing on the Motion.

## II. ISSUE ONE: SUFFICIENCY OF THE EVIDENCE

In issue one, Johnson complains that the evidence was legally insufficient to support the jury's rejection of his self-defense claim and murder conviction.[4]

### A. Standard of Review and Applicable Law

In evaluating legal sufficiency of the evidence to prove the charged offense, we view all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Under the *Jackson* standard, we defer to the jury's responsibility to fairly resolve conflicting testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *See Metcalf*, 597 S.W.3d at 855; *Hooper*, 214 S.W.3d at 13, 16–17. The jury as factfinder is the sole judge of the weight of the evidence and witnesses' credibility, and it may believe all, some, or none of the testimony presented by the

---

[4]Johnson includes a single reference in his brief to the standard for reviewing the factual sufficiency of a jury's rejection of a defense. Apart from this sole mention of factual sufficiency in his standard of review, he consistently argues that the evidence is legally insufficient to support the jury's rejection of his self-defense claim. That said, "both legal and factual sufficiency challenges to the jury's rejection of self-defense [are reviewed] under the *Jackson v. Virginia* standard." *Rankin v. State*, 617 S.W.3d 169, 182 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010)). Thus, we have analyzed this issue as a challenge to the legal sufficiency of the evidence.

parties. *Metcalf*, 597 S.W.3d at 855 (citations omitted). We do not reweigh the evidence or determine the credibility of the evidence, nor do we substitute our judgment for the factfinder's. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (citation omitted); *see also McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted).

A person commits murder if he "[i]ntentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). Texas recognizes the defense of justification, which excludes criminal responsibility for otherwise criminal behavior. *See id.* § 9.02. Self-defense is one type of justification. *See id.* § 9.31. "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a); *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). A person is justified in using deadly force if he would be justified in using force under section 9.31, and he reasonably believed that deadly force was immediately necessary to protect himself against another's use or attempted use of deadly force. *Gamino*, 537 S.W.3d at 510; *see also* Tex. Penal Code Ann. § 9.32(a). "Deadly force" is defined as "force

that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." Tex. Penal Code Ann. § 9.01(3). "Reasonable belief" is a "belief that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(42).

As for the defense of justification,

> a defendant bears the burden of production, which requires the production of some evidence that supports the particular defense. Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove the raised defense. The burden of persuasion is not one that requires the production of evidence, rather it requires only that the State prove its case beyond a reasonable doubt. When a jury finds the defendant guilty, there is an implicit finding against the defensive theory.

*Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (citing *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991)); *see also Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). In reviewing a challenge to the sufficiency of the evidence to support the jury's implicit rejection of self-defense,

> we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.

*Saxton*, 804 S.W.2d at 914 (citations omitted); *see also Braughton*, 569 S.W.3d at 608–09 (citation omitted). Self-defense is a fact issue the jury determines, and it is free to accept or reject any defensive evidence on the issue. *See Saxton*, 804 S.W.2d

19

at 913–14. A jury's guilty verdict constitutes an implicit finding that it rejected the defensive theory. *See Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 914.

"A jury's decision to reject witness testimony must be rational in light of the totality of the record, and any underlying inferences used to reject that testimony must be reasonable based upon the cumulative force of all of the evidence." *Braughton*, 569 S.W.3d at 611 (citing *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)). Moreover, a jury may not disregard undisputed objective facts that only have one logical inference. *Id.* "A jury is permitted to reject even uncontradicted defensive testimony, so long as its rejection of that evidence was rational in light of the remaining evidence in the record and is not contradicted by indisputable objective facts." *See id.* at 612 (citing *Saxton*, 804 S.W.2d at 913–14) (other citations omitted). That said, here, Johnson fails to point us to any part of the record that would render the jury's credibility determinations irrational considering these principles. *See id.*

## B. Analysis

Johnson contends that the cumulative force of the circumstances and evidence runs contrary to the conviction. He also asserts that the evidence shows he acted to stop a clear and immediate threat of murder to himself and his nephews.[5]

---

[5]With this issue, Johnson mentions that the State presented a story in closing arguments and engaged in pure speculation that Jack and Johnson conspired to murder Rebollar with Jack shooting first and Johnson shooting second. Johnson does

Sufficient evidence in the record rationally supports the jury's rejection of Johnson's version of events. *See id.* at 611. According to Johnson's video statements, Rebollar was not looking at him when he fired. Cobb explained how Rebollar would have had to turn around or flip his gun upside down to shoot at Johnson. Additionally, Cobb testified that certain things did not "add up" like the trajectory of the through-and-through shot in Rebollar's cheek, which was consistent with Jack's statement that he shot his dad. The videos show Johnson's calm demeanor, which Wilson characterized as "abnormal" given that Johnson just claimed to have shot Rebollar in self-defense. Johnson admittedly shot Rebollar multiple times, although he did not know how many. The evidence showed that investigators removed eleven casings from the gun that matched Johnson's Glock, which Cobb said were fired that day. Johnson said that he could not see Rebollar's gun, although he knew Rebollar had one and only saw Jack wrestling with something. In his recorded interviews, Johnson added that Jack told him to get his gun ready. Johnson said in his first interview that he did not believe Rebollar would shoot his own kids but claimed Rebollar would shoot him. Johnson also told officers that Jack might lie to protect him. Finally, Jim's testimony shows that Rebollar had disagreements with Jack and

_____

not raise a complaint nor cite any authorities about improper jury argument in this appeal, so we do not address closing arguments. *See* Tex. R. App. P. 38.1 (outlining requirements of appellant's brief), 47.1 (requiring the court of appeals to hand down an opinion as brief as practicable that addresses all issues raised and necessary to the appeal's disposition).

21

with Johnson leading up to the shooting, including Rebollar and Johnson arguing over Rebollar talking "smack" about Johnson's brother as well as an argument over money in the car that day. Jim added that Johnson had him move before the shooting took place. This evidence provides a rational basis on which the jury could have rejected Johnson's defensive claims and determined that his use of deadly force was not immediately necessary to prevent Rebollar from using deadly force against him or that his belief was unreasonable. *See id.*; *Saxton*, 804 S.W.2d at 913–14.

In his brief, Johnson points to the fact that Jack had the best view of Rebollar and tried to wrestle the gun from Rebollar. That said, Jack did not testify, and Johnson told police during his interviews that he could not see what Jack's hands were on, only that he looked scared and was wrestling with something. The jury was free to evaluate Johnson's statements to police admitted into evidence and disregard mistakes or inconsistencies while crediting other portions of his story. *See Metcalf*, 597 S.W.3d at 855; *Braughton*, 569 S.W.3d at 612; *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony.").

The jury was free to do the same with Jim's testimony, the officers' testimony, and the videos from the scene. *See Metcalf*, 597 S.W.3d at 855; *Braughton*, 569 S.W.3d at 612; *Febus*, 542 S.W.3d at 572. To the extent that Johnson argues other witness testimony must be disregarded in its entirety because their accounts

22

contradicted his or that their testimony was wholly contradicted by the objective ballistics evidence, we disagree. Johnson contends in his brief that the ballistics evidence showed Rebollar's weapon fired six shots that day, possibly when Jack attempted to wrestle the gun from Rebollar. Cobb's testimony directly undercuts this theory, as he explained that they could not determine when the bullets were fired that led to the casings in the floorboard by Rebollar's feet. Cobb's testimony is consistent with other evidence that Rebollar had previously been involved in drive-bys and always carried a gun, which offered a rational explanation for why casings matching Rebollar's gun may have been found in his truck, as would the possibility that Jack fired a shot at Rebollar. In contrast, Johnson himself claimed nobody else fired a shot that day in the car. The jury was free to reject or accept all, some, or none of the witnesses' testimony. *See Metcalf*, 597 S.W.3d at 855; *Braughton*, 569 S.W.3d at 612; *Febus*, 542 S.W.3d at 572.

In this case, evidence undermining Johnson's claim of self-defense showed that: Johnson shot Rebollar multiple times in the back of the head; Johnson admittedly could not see a weapon; Rebollar had disagreements with Jack and Johnson leading up to the shooting; Johnson's demeanor was "abnormal" after the shooting; Jack told him to get his gun ready; witnesses and video supported the possibility that Jack fired also; and Johnson told Jim to move before the shooting. These were all facts from which a jury could have rationally rejected Johnson's

23

version of events. The jury did not have to accept Johnson's version of events under the circumstances outlined above, since its rejection was "rational in light of the totality of the record," and the underlying inferences used to reject Johnson's claims were "reasonable based upon the cumulative force of all of the evidence." *Braughton*, 569 S.W.3d at 611 (citing *Adames*, 353 S.W.3d at 860). The jury could reject uncontradicted defensive testimony, as long as rejecting that evidence was rational considering the remaining evidence in the record and is not contradicted by indisputable objective facts. *See id.*; *see also Saxton,* 804 S.W.2d at 913–14; *Brooks*, 323 S.W.3d at 907.

Given the absence of evidence in the record suggesting that the jury was irrational in rejecting the defensive testimony that would have established Johnson's claims of self-defense or defense of a third person, we decline to substitute our view of the witnesses' credibility for that of the jury. *See Braughton v. State*, 522 S.W.3d 714, 734–35 (Tex. App.—Houston [1st Dist.] 2017), *aff'd* 569 S.W.3d 592 (Tex. Crim. App. 2018) ("We cannot substitute our own view of these witnesses' credibility based on a cold record for that of the factfinder."); *Saxton*, 804 S.W.2d at 913. We hold the evidence is sufficient to support (1) the jury's rejection of Johnson's self-defense claim, and (2) that he knowingly and intentionally caused Rebollar's death, thus his murder conviction. *See* Tex. Penal Code Ann. §

24

19.02(b)(1); *Braughton*, 569 S.W.3d at 611; *Saxton*, 804 S.W.2d at 913–14. We overrule issue one.

### III. ISSUE TWO: DENIAL OF CONTINUANCE

In his second issue, Johnson complains the trial court erred by "effectively denying" his Motion for Continuance based on (1) violations of Texas Code of Criminal Procedure article 39.14 and (2) possible *Brady* violations. *See* Tex. Code Crim. Proc. Ann. art. 36.14; *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that prosecution's suppression of exculpatory evidence upon request violates due process where the evidence is material to guilt or punishment, regardless of prosecution's good or bad faith).[6]

### A. Error Preservation and Applicable Law

To preserve a complaint for appellate review, the complaining party must timely object in the trial court stating the grounds for the ruling sought "with sufficient specificity to make the trial court aware of the complaint." Tex. R. App. P. 33.1(a)(1)(A). "The purpose of requiring [an] objection is to give the trial court or the opposing party the opportunity to correct the error or remove the basis for the objection." *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005) (quoting *Martinez v. State*, 22 S.W.3d 504, 507 (Tex. Crim. App. 2000)).

---

[6]Johnson points to no specific evidence disclosed untimely that harmed him.

Additionally, to preserve error, a party must "obtain a ruling on the complaint or object to the trial judge's refusal to rule." *Smith v. State*, 499 S.W.3d 1, 5 (Tex. Crim. App. 2016) (citing Tex. R. App. P. 33.1(a)(2)). *Brady* complaints are also subject to error-preservation rules. *See Keeter v. State*, 175 S.W.3d 756, 759–61 (Tex. Crim. App. 2005).

**B. Analysis**

We begin with Johnson's complaint on appeal that there were *Brady* violations. The record does not show that Johnson cited *Brady* violations in his Motion for Continuance or ever complained in the trial court of a *Brady* violation, which is subject to error preservation rules. *See id.*; *see also* Tex. R. App. P. 33.1(a)(1)(A). The Motion for Continuance filed by his attorney only mentioned article 39.14 and Michael Morton Act violations. *See generally* Tex. Code Crim. Proc. Ann. art. 39.14 (governing production of documents by the State to a defendant). Having failed to raise any *Brady* violation in the trial court, we hold that Johnson has not preserved this complaint for our review. *See* Tex. R. App. P. 33.1(a)(1)(A); *Keeter*, 175 S.W.3d at 759–61.

We next address Johnson's Michael Morton Act complaint under article 39.14. Although the record shows his attorney filed a verified Motion for Continuance at 8:34 the morning trial began and trial commenced that day, it does not show that defense counsel presented the Motion to the trial court or that the trial court was

26

given an opportunity to rule on the Motion. *See Reyna*, 168 S.W.3d at 179 (noting purpose of requiring an objection is to give the trial court an opportunity to correct the error or remove the basis for the objection); *Martinez*, 22 S.W.3d at 507. Further, without a signed order, a notation in the docket sheet, or any discussion of the Motion for Continuance in the Reporter's Record, the record does not show that the trial court adversely ruled expressly or implicitly on the Motion or that Johnson complained about the trial court's refusal to rule. *See* Tex. R. App. P. 33.1(a)(2); *Smith*, 499 S.W.3d at 5. We hold that where Johnson filed a verified Motion for Continuance raising his article 39.14 complaint, but the record does not show that the trial court was aware of the Motion and made an adverse ruling, and Johnson did not object to the trial court's refusal to rule, he has also failed to preserve this complaint for our review. *See* Tex. R. App. P. 33.1(a)(2); *Smith*, 499 S.W.3d at 5. We overrule issue two.

## IV. ISSUE THREE: INEFFECTIVE ASSISTANCE OF COUNSEL

In his third issue, Johnson complains that he received ineffective assistance of counsel. In support of this issue, he argues that his trial counsel failed to: (1) obtain a ruling on the continuance; (2) adequately investigate and present the State's late-produced evidence; (3) present the testimony of the key eyewitness, Jack; (4) meaningfully confront the State's forensic and ballistics evidence; and (5) request an alternative jury instruction for desecration of a corpse. The State responds that

27

the record is insufficient to show counsel's performance was deficient, and the jury instruction for desecration of a corpse is unsupported by the record.

## A. Standard of Review and Applicable Law

The United States Constitution and the Texas Constitution guarantee an accused the right to assistance of counsel. *See* U.S. CONST. amend. VI; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 1.051. This right necessarily includes the right to reasonably effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). When a defendant complains counsel was ineffective, our review of counsel's performance is highly deferential with a strong presumption that counsel's performance fell within the wide range of reasonable professional assistance. *Id.* at 689; *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011) (citing *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006)). To overcome that presumption, an appellant must satisfy the two prongs set out in *Strickland v. Washington* by demonstrating with a preponderance of the evidence that (1) counsel's representation fell below an objective standard of reasonableness, and (2) the deficient performance prejudiced the defense. *Lopez*, 343 S.W.3d at 142 (citing *Strickland*, 466 U.S. at 689); *see also Hernandez v. State*, 726 S.W.2d 53, 55–57 (Tex. Crim. App. 1986) (adopting and applying the *Strickland* test). We look to the totality of the representation, and ordinarily counsel should not be judged on isolated portions of the representation. *See Thompson v. State*, 9 S.W.3d 808, 813

28

(Tex. Crim. App. 1999); *see also Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012). We "consider the reasonableness of counsel's actions at the time, rather than viewing such actions through the benefit of hindsight." *Hart v. State*, 667 S.W.3d 774, 782 (Tex. Crim. App. 2023) (citation omitted). Trial counsel should be afforded an opportunity to explain the challenged actions before we denounce their actions as ineffective. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (citation omitted). When counsel has not been given an opportunity to explain the challenged actions, we will find deficient performance only if the conduct was "so outrageous that no competent attorney would have engaged in it." *Id.* (citation omitted). The record on direct appeal is generally insufficient to show that counsel's performance was deficient. *Id.*

**B. Analysis**

Johnson asserts his trial counsel behaved ineffectively by failing to do the five things identified above. Johnson did not file a Motion for New Trial alleging ineffective assistance of counsel nor was there a hearing addressing counsel's effectiveness. Johnson's trial counsel was not afforded an opportunity to explain her actions, so we will not find her performance deficient unless the conduct was "so outrageous that no competent attorney would have engaged in it." *Id.*

**1. Continuance and Late-Produced Evidence**

As to the continuance and failing to investigate the State's late-produced evidence, there is no explanation in the record for why the continuance was not presented to the trial court and ruled on. The record also does not contain even a cursory description of the "hundreds of pages" that the State allegedly produced on the eve of trial and whether those documents were relevant, material, or in any way helpful to the defense. Under these circumstances, we cannot say that counsel's conduct was so egregious that no competent attorney would have engaged in it as it related to the continuance and any late-produced documents. *See id.; see also Strickland*, 466 U.S. at 687; *Lopez*, 343 S.W.3d at 142. Nor does the record establish that but for counsel's deficient performance, the outcome of Johnson's trial would have been different. *See Strickland*, 466 U.S. at 687; *Lopez*, 343 S.W.3d at 142.

**2. Uncalled Witness and Challenging Forensic and Ballistics Evidence**

Johnson next complains his counsel was ineffective for failing to present his nephew Jack, the front seat passenger and for failing to "meaningfully confront" the State's forensic and ballistics evidence. Again, the record is silent as to trial counsel's strategy for this. An appellant complaining of trial counsel's failure to call witnesses must show (1) the witnesses were available, and (2) he would have benefitted from their testimony. *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983); *see also Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010) (citation

30

omitted). Regarding Jack, there is no evidence he was available as a witness nor was there any indication that his testimony would have helped Johnson. *See Perez*, 310 S.W.3d at 894; *King*, 649 S.W.2d at 44.

Likewise, considering Johnson's admissions that he shot Rebollar repeatedly in the back of the head and killed him, we cannot say that trial counsel should have done more to challenge the forensics or ballistics evidence. Johnson points to counsel's failure to question the forensic pathologist given the possibility there may have been two shooters. The record shows, though, that the ballistics report showing bullet casings from two weapons in the truck, was admitted into evidence by defense counsel. Counsel also elicited testimony that at least six of the casings in the truck were fired from Rebollar's weapon. The record is again silent as to the reasoning for counsel's choices or strategy, so given our highly deferential review, we presume that counsel's performance fell within the wide range of reasonably professional assistance. *See Strickland*, 466 U.S. at 689; *Lopez*, 343 S.W.3d at 142.

### 3. Alternative Jury Instruction for Desecration of a Corpse

Lastly, Johnson argues that counsel's failure to request an alternative jury instruction for "desecration of a corpse" constituted deficient performance. Johnson points to evidence that Jack might have shot Rebollar, so there was a question of whether Johnson even fired the fatal shot. The State responds that there is no crime in Texas for desecration of a corpse, only for abuse of corpse. *See* Tex. Penal Code

31

Ann. § 42.08. The State also argues that abuse of corpse is not a lesser-included offense of murder, so counsel's performance was not deficient for failing to request this.

For counsel's performance to be ineffective for failing to request a lesser-included offense instruction, the appellant must show he was entitled to an instruction on the lesser-included offense. *See Cardenas v. State*, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000). To establish that he was entitled to a lesser-included offense instruction, Johnson must establish (1) that abuse of corpse is a lesser-included offense of murder, and (2) there was evidence that, if guilty of an offense, he was only guilty of the lesser-included offense. *See id.* Our sister court in Houston explained that "the offense of abuse of corpse cannot be committed until after there is a corpse." *Foyt v. State*, 602 S.W.3d 23, 40 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd) (citing Tex. Penal Code Ann. § 42.08(a)(1)). "By definition one cannot murder a corpse[,]" so when the State alleges murder, it does "not allege all the elements of abuse of corpse or facts from which all the elements of abuse of corpse could be deduced." *Id.* Thus, neither abuse of corpse nor tampering with evidence are lesser-included offenses of murder. *See id.* Since Johnson cannot establish that abuse of corpse is a lesser-included offense of murder, he cannot establish counsel's performance was deficient for failing to request such an

instruction, as he was not entitled to it when the offense alleged was murder. *See Cardenas*, 30 S.W.3d at 392; *Foyt*, 602 S.W.3d at 40.

Reviewing counsel's performance deferentially, given the record's silence and counsel's lack of an opportunity to explain her reasoning, we hold that her conduct was not "so outrageous that no competent attorney would have engaged in it[,]" thus we cannot conclude her performance was deficient. *See Goodspeed*, 187 S.W.3d at 392. As addressed above, absent a showing of deficient performance with the complained-of conduct, we hold that Johnson has failed to meet the first Strickland prong. *See Strickland*, 466 U.S. at 689; *Lopez*, 343 S.W.3d at 142. We overrule issue three.

## V. ISSUE FOUR: EXCLUSION OF TESTIMONY

In issue four, Johnson complains the trial court improperly excluded Veronica Vo's "testimony" about Rebollar's mental state. The State argues that Johnson failed to preserve this complaint for our review.

### A. Relevant Facts

While defense counsel cross-examined Cobb, she approached the bench and stated she would later play a recording of a phone call Rebollar's girlfriend, Vo, had with Cobb. The prosecutor then told the trial court that "the essence of that is to show the well-founded fear of the Defendant, that when, according to his testimony to the officer, the victim was talking about doing a drive-by shooting, and this telephone

33

conversation talks about the victim of the murder doing a drive-by shooting." Defense counsel also explained the conversation referenced a drive-by earlier that day with one of his sons who was in the car. The State then objected that it was extraneous bad character evidence of the victim meant to tarnish his reputation and bolster Johnson's self-defense claim, but unless Johnson knew of the drive-by, it was irrelevant. Johnson's trial counsel responded that she was unaware that Johnson knew about an earlier drive-by. Trial counsel responded the recording was still relevant to provide context for that day and the events leading up to the shooting, it went to Rebollar's state of mind, that he was intoxicated, and "gives credit to some of what [Johnson] said about [Rebollar's] kids and [Rebollar.]" She also noted it was consistent with some things Jack said on video played for the jury about his dad "already talking about drive-bys today[.]" Johnson's counsel also argued that it was more probative than prejudicial.

The trial court explained that "unless there's a showing that [Johnson] knew about that, then that wouldn't be relevant to open up[.]" The trial court then said, "I will look at this some more. For right now, let's not go there, but I will look at that some more." Thereafter, in open court, the trial court suggested he was available after lunch to discuss it further, and they could do so. Johnson's trial counsel did not attempt to question Cobb about the details of his conversation with Vo, nor did she try to call Vo as a witness. Although during the hearing outside the jury's presence,

34

trial counsel described some of what was in the recording, trial counsel also did not proffer the recorded conversation as an exhibit for appellate purposes, so it is not available in the record for our review. Separately, trial counsel did not describe the substance of any testimony Vo would provide if called as a witness.

**B. Standard of Review and Applicable Law**

"'Error may not be predicated upon a ruling which ... excludes evidence unless a substantial right of the party is affected, and ... the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.'" *Holmes v. State*, 323 S.W.3d 163, 168 (Tex. Crim. App. 2009) (quoting former version of Tex. R. Evid. 103(a)(2)). In other words, to preserve error as to the exclusion of evidence, a party must attempt to introduce the evidence and obtain an adverse ruling from the trial court or object to the trial court's refusal to rule. *See* Tex. R. App. P. 33.1(a); Tex. R. Evid. 103(a)(2); *Castillo v. State*, 573 S.W.3d 869, 881 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). "An offer of proof to be accomplished by counsel's concise statement must include a reasonably specific summary of the evidence offered and must state the relevance of the evidence unless the relevance is apparent, so that the court can determine whether the evidence is relevant and admissible." *Warner v. State*, 969 S.W.2d 1, 2 (Tex. Crim. App. 1998). The offer of proof serves two purposes: (1) it enables an appellate court to determine whether the exclusion was erroneous and harmful; and (2) it

permits the trial judge to reconsider his ruling in light of the actual evidence. *See Holmes*, 323 S.W.3d at 168. A trial court's ruling may be either express or implicit. *See* Tex. R. App. P. 33.1(a); *Montanez v. State*, 195 S.W.3d 101, 104 (Tex. Crim. App. 2006) (citation omitted); *Rey v. State*, 897 S.W.2d 333, 336 (Tex. Crim. App. 1995). If the ruling is implicit, the trial court's "actions or other statements otherwise" must "unquestionably indicate a ruling." *Montanez*, 195 S.W.3d at 104; *Rey*, 897 S.W.3d at 336.

## C. Analysis

In his brief, Johnson does not distinguish between Vo's recorded conversation with Cobb, which would have been an exhibit played for the jury, and Vo testifying at trial. Although the hearing outside the jury's presence addressed the recorded exhibit, it did not address Vo testifying at trial. As to Vo's testimony, since there was no attempt to call her as a witness, no offer of proof of what her anticipated testimony would be, and no adverse ruling excluding any testimony, Johnson failed to preserve any complaint about Vo's testimony for our review. *See* Tex. R. App. P. 33.1(a); Tex. R. Evid. 103(a)(2); *Castillo*, 573 S.W.3d at 881.

As to the exhibit containing the conversation between Cobb and Vo, even if we considered counsel's statements that she intended to play the exhibit and the descriptions about the recording's contents being a sufficient offer of proof, counsel failed to obtain a ruling or object to the lack of a ruling. *See* Tex. R. App. P.

36

33.1(a)(2). The record shows that the trial court essentially took the matter of the recording under advisement by stating it would "look at this some more" but "[f]or right now, let's not go there[,]" and that it was available "after lunch" to take the matter up further. The trial court did not expressly rule, and because the trial court's "actions or other statements otherwise" did not "unquestionably indicate a ruling[,]" it did not implicitly rule. *See Montanez*, 195 S.W.3d at 104; *Rey*, 897 S.W.3d at 336. Despite the trial court's statement regarding its availability, the record does not show that Johnson's trial counsel addressed the recording again, sought clarification, or objected to the trial court's refusal to rule. *See* Tex. R. App. P. 33.1(a)(2). Since Johnson failed to obtain an adverse ruling or object to the trial court's refusal to rule on the admissibility of the recorded conversation between Vo and Cobb, we hold that he has failed to preserve that complaint for our review. *See id.*

We overrule issue four.

## VI. CONCLUSION

Having overruled each of Johnson's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on February 18, 2026
Opinion Delivered May 27, 2026
Do Not Publish
Before Golemon, C.J., Johnson and Wright, JJ.